UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>MONTE SHEPHERD,<br><br>　　　　　Defendant. | No. 2:24-cr-00083-DJC-1<br><br><br>ORDER |

　　　　Defendant Monte Shepherd brings the present Motion to Suppress arguing that the evidence of his criminal conduct was wrongfully obtained through the violation of his Fourth Amendment rights.  As discussed below, the detaining officer had reasonable suspicion to stop Defendant to investigate a domestic violence disturbance where Defendant was in the immediate vicinity in the middle of the night, and the firefighters who had called in the incident were shining a flashlight on him when the officer arrived.  Once the firefighters clarified that the Defendant was not the assailant however, the officer lacked reasonable suspicion to detain him any further. While the officer had understandable concern that Defendant was carrying a concealed firearm while intoxicated, doing so in California is, surprisingly to the Court, not a crime that justifies continued detention.  Moreover, after the Supreme Court's decision in *New York State Rifle and Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022),

and the subsequent change in California's firearm licensing scheme, the officer would not have been justified in assuming that the Defendant lacked a concealed carry permit.  Since the officer unlawfully prolonged the stop by running searches on Defendant's name and the serial number of the firearm found on Defendant in violation of the Fourth Amendment, the evidence obtained through this illegal search must be suppressed.  The Court therefore GRANTS Defendant's Motion.

## I.     Background

On January 27, 2024, officers responded to calls reporting a battery outside of a fire station in Sacramento at around 1:30 in the morning.  (Criminal Compl. (ECF No. 1) ¶ 7.)  There were two phone calls placed to 911 regarding the incident: one in which the caller, a private citizen, reported only hearing the incident, and the second from the Sacramento Fire Department.  (*Id.* ¶ 8.)  The Fire Department stated that the assailant was male, and that he was outside of the Fire Station on a bike yelling.  (*Id.*)  No other description was provided.

When the officer arrived on the scene, Defendant, a male, was passing by the fire station and a firefighter near the building was shining his flashlight in Defendant's direction.  (*Id.* ¶ 8; Opp'n (ECF No. 29), Ex. 4 at 00:55-1:06.)  The officer asked Defendant to stop and walk over to his patrol car.  Defendant backed away and stated that he was not involved despite the officer's multiple orders commanding him to stop.  The officer then pointed his taser at Defendant and told Defendant he would be tased if he did not comply.  (Compl. ¶ 11; Ex. 4 at 1:00-1:18.)

Defendant eventually placed his hands on the patrol car and declared that he was carrying both a gun and knife.  (Ex. 4 at 1:18-20.)  The officer then conducted a pat down and removed a gun concealed in Defendant's waistband.  (*Id.* at 1:21-1:25.)  During the course of the pat down, the officer was standing close to Defendant, and believed that Defendant exhibited signs of being intoxicated, including smelling of alcohol, having red eyes, and being unsteady on his feet.  (Compl. ¶ 12.)

////

The officer placed Defendant in the back of his patrol vehicle while he investigated the crime. (Compl. ¶ 13.) As he did so, he learned from speaking with the firefighters on the scene that Defendant was not the assailant. (*Id.*) The officer did not let Defendant go after learning this information, telling the firefighters on the scene "well, he's drunk, and he has a gun." (Ex. 4 at 04:45–48.) After returning from speaking with the victim and further confirming that Defendant was not the assailant, the officer proceeded to run a search on the serial number of the gun and on Defendant's name, after which he learned that the gun was stolen and that Defendant had prior felonies. (*Id.* at 11:50; 24:37.) The officer then placed Defendant under arrest. The United States has charged Defendant with one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) and two count of Criminal Forfeiture under 18 U.S.C. § 924(d)(1) and 28 U.S.C. § 2461(c). (Indictment (ECF No. 8).)

Defendant brings the present Motion to Suppress arguing that the evidence of Defendant's criminal conduct was wrongfully obtained through the violation of Defendant's Fourth Amendment rights. First, he argues that the officer did not have reasonable suspicion to conduct a *Terry* stop in the first instance because of the minimal information known to the officer; second, that the stop was converted into an arrest without probable cause when the officer threatened the use of his taser; and third, that the officer did not have an independent basis to prolong the stop and run the gun's serial number or Defendant's name after learning that Defendant was not implicated in the battery. (*See* Mot. to Suppress (ECF No. 24) and Reply (ECF No. 32).) The Government has opposed the Motion (Opp'n (ECF No. 29)) and Defendant has filed a Reply (ECF No. 32). The Court held a hearing on the Motion on August 15, 2024 with Douglas J. Beevers appearing for Defendant and R. Alex Cardenas appearing for the United States. Following the hearing, both Parties submitted supplemental briefing, (ECF Nos. 38 and 39), after which the Court took this matter under submission.

**II.     Legal Standard for Motion to Suppress**

The Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated and no warrants shall issue, but upon probable cause." U.S. Const. amend. IV.  Warrantless searches and seizures violate the Fourth Amendment unless they fall within one of a "few specifically established and well-delineated exceptions."  *Minnesota v. Dickerson*, 508 U.S. 366, 372 (1993) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)).  "Because warrantless searches and seizures are *per se* unreasonable, the government bears the burden of showing that a warrantless search or seizure falls within an exception to the Fourth Amendment's warrant requirement."  *United States v. Cervantes*, 703 F.3d 1135, 1141 (9th Cir. 2012).

Under the exclusionary rule, a criminal defendant may move to suppress evidence obtained in violation of the Fourth Amendment.  *See, e.g.*, *United States v. Calandra*, 414 U.S. 338, 341 (1974); Fed. R. Crim. P. 41(h).  The exclusionary rule covers not just evidence obtained as a direct result of the illegal search or seizure, but also evidence derived from that illegality, which is considered "fruit of the poisonous tree."  *United States v. Ngumezi*, 980 F.3d 1285, 1291 (9th Cir. 2020).  When deciding a motion to suppress, courts first determine whether a Fourth Amendment violation occurred, and then whether suppression is appropriate.  *See Davis v. United States*, 564 U.S. 229, 236–39 (2011).

**III.     Discussion**

**A.     The initial stop was supported by reasonable suspicion.**

"[A]n officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *Terry v. Ohio*, 392 U.S. 1 (1986)).  "The 'reasonable suspicion' necessary to justify such a stop 'is dependent upon both the content of information possessed by police and its degree of reliability'" and depends on the totality of the circumstances. *Navarette v.*

4

*California*, 572 U.S. 393, 397 (2014) (quoting *Alabama v. White*, 496 U.S. 325, 330 (1990)).  "The quantum of proof needed for reasonable suspicion is less than a preponderance of evidence, and less than probable cause." *United States v. Tiong*, 224 F.3d 1136, 1140 (9th Cir. 2000).

Here, the totality of the circumstances is such that the officer had reasonable suspicion sufficient to justify stopping Defendant in the first instance.  First, the officer knew that the suspect was a male and was outside of the fire station based on the highly reliable report of the Fire Department.  When the officer arrived on the scene, Defendant, a male, was outside of the fire station.  The fact he was present at the scene at 1:30 in the morning is significant because the officer would reasonably not have expected many people to be on the street on that time, and it was therefore reasonable to conclude that the man he saw at the scene of the crime was the suspect. *See Jackson v. Johnson*, 797 F. Supp. 2d 1057, 1064 (D. Mont. 2011)  ("[T]he presence of a passerby on a residential street at one o'clock in the morning would naturally arouse much more suspicion" than a passerby in a busy area in the middle of the day).  Further, when the officer arrived, a firefighter who was presumably aware of the incident was shining a light illuminating Defendant.  (Opp'n, Ex. 4 at 0:53–1:05.)[1]  It was reasonable for the officer to understand that action as an indication that Defendant was the suspect.  These facts taken together provide a basis for the officer to have reasonably suspected that Defendant had committed the reported battery and to stop him.  Defendant argues that he did not fit the description because he was not yelling and did not have a bike.  However, both those aspects of the description, unlike a person's gender presentation, are easily and quickly altered.  A person may stop yelling, or get off their bike before the police arrive.  The fact that Defendant did

---

[1] Defendant submitted a supplemental declaration from investigator Melvin Buford who interviewed the fire captain, Kyle Gordon.  In the interview, Gordon purportedly stated that neither he, nor any of his colleagues, possessed a flashlight or shined a flashlight at Defendant.  The body camera video of the incident, however, indisputably shows that a fire fighter not only possessed a flashlight, but that he shined the flashlight toward Defendant.  Accordingly, the Court affords the declaration little weight.

not fit these aspects of the description therefore does not detract from the reasonableness of the officer's suspicion about Defendant.

The officer was therefore justified in stopping Defendant to investigate his possible involvement in the reported crime.

### B. The use of force did not convert the stop into an arrest.

In contrast to a brief investigatory stop which may be founded on reasonable suspicion, an arrest must be supported by probable cause; such an arrest occurs when, "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *California v. Hodari D.*, 499 U.S. 621, 628 (1991).  The use of force or intrusive measures can turn a stop into an arrest. *Washington v. Lambert*, 98 F.3d 1181, 1185 (9th Cir. 1996).  A court determines "whether the police action constitutes a *Terry* stop or an arrest by evaluating not only how intrusive the stop was, but also whether the methods used were reasonable *given the specific circumstances*." *Id.* (emphasis in original).  "[W]hile certain police actions constitute an arrest in certain circumstances, e.g., where the 'suspects' are cooperative, those same actions may not constitute an arrest where the suspect is uncooperative or the police have specific reasons to believe that a serious threat to the safety of the officers exists." *Id.*  The use of more intrusive means to effect a stop may be justified "1) where the suspect is uncooperative or takes action at the scene that raises a reasonable possibility of danger or flight; 2) where the police have information that the suspect is currently armed; 3) where the stop closely follows a violent crime; and 4) where the police have information that a crime that may involve violence is about to occur." *Id.* at 1189.

In *Jackson v. Johnson*, cited by Defendant, the court found that drawing a taser converted an encounter into an arrest. 797 F. Supp. 2d at 1066.  However, in that case the court found that none of the *Lambert* factors were present.  There, the defendant had been stopped in relation to a car accident after he was seen walking the opposite direction from the scene. *Id.* at 1061.  He did not quicken his pace and stopped and

turned around when he was ordered to stop walking. *Id.* It was only after the suspect stopped walking and put his hands up that the officer drew the taser. *Id.* The incident failed to satisfy *Lambert* because it did not involve any crime of violence or threatened future violence, there was no information that the suspect was armed, and, importantly, the suspect was complying, such that there was no risk of flight. *Id.* at 1066.

Here, in contrast, multiple of the *Lambert* factors were present which make the show of force reasonable under the circumstances. First, the officer was responding to a reported battery which is a crime of violence. Second, Defendant was not cooperative with the officer and attempted to leave the scene. Because Defendant would not stop after the officer's repeated commands for him to stop, the officer acted reasonably by using a more intrusive technique to effectuate the stop. Courts have found drawing a gun to be a reasonable means to effectuate a stop under some circumstances, and drawing a taser is a much less aggressive show of force than a gun.[2] *See Jackson,* 797 F. Supp. 2d at 1065 (collecting cases). The officer made it known to Defendant that he was drawing a taser and not a gun, so Defendant would not have been under the impression that a gun was drawn. And, unlike in *Jackson*, the officer did not use the taser on Defendant. Accordingly, the officer's threatened use of the taser was warranted and did not convert the stop into an arrest.

**C.     There was no justification to prolong the stop.**

While the initial stop was justified, the main issue presented by Defendant's Motion is whether the *continuation* of the stop to further examine the firearm carried by the Defendant was permissible. "[T]he tolerable duration of police inquiries . . . is

---

[2] In his declaration, Defendant states that "[t]he other officer pulled a firearm and pointed it at me" and requests that the Court hold an evidentiary hearing to determine the timing of when the other officer drew this weapon. (M. Shepherd Decl. (ECF No. 32).) However, this allegation is fully unsupported by the bodyworn camera footage of the officer who conducted the stop. In the video, it is clear that the officer initiated the stop alone and that Defendant had his full attention on the stopping officer. No other officer is seen or heard at that point in the stop. Because the Court concludes that no genuine contested issues of fact exist, the Court declines to hold an evidentiary hearing on this issue. *See United States v. Howell*, 231 F.3d 615, 620 (9th Cir.2000), *cert. denied*, 534 U.S. 831 (2001).

7

determined by the seizure's 'mission.'" *Rodriguez v. United States*, 575 U.S. 348, 354 (2015).  An officer may briefly stop an individual suspected of being involved in a crime "in order to determine his identity or to maintain the status quo momentarily while obtaining more information," *Williams*, 407 U.S. at 146, but once the purpose of the stop is completed, "the authority for the seizure thus ends," *Rodriguez*, 575 U.S. at 354.  Any prolongation of the stop thereafter must be supported by independent reasonable suspicion. *United States v. Evans*, 786 F.3d 779, 786 (9th Cir. 2015); *United States v. Landeros*, 913 F.3d 862, 868 (9th Cir. 2019).  A stop is not prolonged if the officer is conducting an inquiry which is normally incident to that mission.  For example, although running a vehicle check while conducting a vehicle stop does not prolong the mission of the stop, running a felony registration check is "a measure aimed at 'detect[ing] evidence of ordinary criminal wrongdoing'" not aimed at the mission of the vehicle stop, and therefore prolongs the stop. *Evans*, 786 F.3d at 786 (quoting *Indianapolis v. Edmond*, 531 U.S. 32, 40–41 (2000)).

In this case, the purpose of the initial stop ended well before the officer ran a search on Defendant's name and the serial number of the gun.  Shortly after Defendant was stopped, the officer learned that Defendant was not the assailant of the battery.  At that point, the officer would have completed his "mission" to investigate Defendant and determine whether Defendant was involved in that crime. The additional searches which the officer conducted, including running the serial number of the firearm and a felony background check on Defendant, were not aimed at determining whether Defendant was involved in the battery, and occurred well after the officer had confirmed that Defendant was not involved.  Accordingly, the officer would have needed independent reasonable suspicion to continue the stop and perform these searches.

The Government asserts that Defendant's possession of a firearm was sufficient to create suspicion of criminal wrongdoing.  Prior to the Supreme Court's decision in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022), carrying a

"concealed firearm c[ould] form the basis for a *Terry* stop" in California because "carrying a concealed weapon [wa]s presumptively unlawful" based on California's "may-issue" licensing scheme. *United States v. Bontemps*, 977 F.3d 909, 915 (9th Cir. 2020); Cal. Penal Code § 26150 (2016). However, following the decision in *Bruen*, California first stopped enforcing the "good cause" provision of its licensing scheme that was similar to the New York scheme at issue in *Bruen*, and then amended the law to require that a concealed permit "shall issue" to applicants who meet certain criteria. *See* Cal. Dep't of Justice, *Legal Alert*, OAG-2022-02 (June 24, 2022); Cal. Penal Code § 26150(a) (2024); Cal. Penal Code § 26202. These amendments were in effect during the incident in question.

Defendant argues that because California is now a "shall issue" jurisdiction, carrying a concealed weapon is presumptively lawful and therefore cannot form the basis for reasonable suspicion in accordance with *United States v. Willy*, 40 F.4th 1074, 1081 (9th Cir. 2022), and *United States v. Brown*, 925 F.3d 1150, 1154 (9th Cir. 2019). In those cases, the Ninth Circuit stated that carrying a firearm in Washington, a shall issue jurisdiction operating under a similar licensing scheme, is presumptively lawful, and merely carrying a firearm is therefore not sufficient to support a *Terry* stop. *Willy*, 40 F.4th at 1081 (open carry); *Brown*, 925 F.3d at 1154 (concealed carry);[3] *cf. Delaware v. Prouse*, 440 U.S. 648, 663 (1979) (holding that unless there is a particularized suspicion that a driver is unlicensed, officers are prohibited from stopping drivers solely to ensure compliance with licensing and registration laws). The Court agrees that California's new licensing scheme closely resembles Washington's and necessitates a similar outcome. *Compare*, Cal. Penal Code § 26150(a) (2024), *with* Wash. Rev. Code § 9.41.070. Accordingly, merely carrying a concealed firearm in California is presumptively lawful and, standing alone, cannot

---

[3] In *United States v. Holmes*, No. 22-50003, 2023 WL 4196896, at *1, n.1 (9th Cir. June 27, 2023) the Ninth Circuit decline to opine on the effect of *Bruen* on California's licensing scheme because the arrest in that case had occurred in 2021 before the changes to the law.

support reasonable suspicion of criminal activity.

Although carrying a concealed weapon is presumptively lawful, doing so in an unlawful manner may nevertheless form a basis for reasonable suspicion. In *Willy*, despite finding that there was no probable cause to arrest the defendant, the court held that there would have nevertheless been *reasonable suspicion* to detain and question the defendant. 40 F.4th at 1087. Although it is presumptively lawful to carry a firearm in Washington, it is not lawful to do so in a way that intimidates other people. *Id*. at 1081. The officer had a reasonable basis to believe that the defendant was violating this law because he was acting delusional and displaying his gun to multiple people, and the officer would have been justified in stopping him to investigate this potential violation. *Id*. at 1078, 1087–89; *compare Brown*, 925 F.3d at 1154–55 (finding no reasonable suspicion where the only evidence that defendant was carrying the gun in an unlawful manner came from an anonymous tip). However, by arresting the defendant without further investigation, the officer violated the Fourth Amendment because he did not at that point have probable cause for arrest. *Id*. at 1089.

In this case, however, there was no similar evidence that Defendant possessed the firearm in violation of the law to support reasonable suspicion of criminal wrongdoing. Although California imposes conditions on a concealed carry license, including prohibiting the consumption of *any* alcohol, the violation of those conditions does not create criminal liability. *See* Cal. Penal Code § 26200 (a)(1)–(3). Thus, although the officer reported that he believed Defendant was intoxicated and continued to detain Defendant because "well, he is drunk and he has a gun," (Opp'n, Ex. 1 at 5; Opp'n, Ex. 4 at 04:45–48), such behavior is not itself illegal. Despite an opportunity to provide supplemental briefing on the issue, the Government has not established that a violation of Penal Code section 26200 is criminally punishable. The Government attempts to equate carrying a firearm in violation of the licensing conditions to carrying a firearm without a license at all. However, neither section

states that carrying a firearm in violation of a licensure provision should be construed as a violation of section 25400 and the Government did not identify, and the Court cannot find, any cases which have reached such a conclusion.  Because carrying a firearm while under the influence of alcohol is not criminally punishable, it cannot support reasonable suspicion of criminal activity.

The Government provides no further basis to support a finding of reasonable suspicion beyond Defendant's intoxication and possession of a firearm.[4]  The Government has therefore failed its burden to show that there was independent reasonable suspicion which justified the prolongation of the stop.

### D. Any mistake of law was unreasonable.

The government argues in it supplemental brief that the officer made a reasonable mistake of law by believing Defendant to be in violation of Health and Safety Code § 11370.1.  The Government has repeatedly misstated that this law prohibits the possession of a firearm while intoxicated, when in reality the law prohibits the possession of particular controlled substances, including heroin and cocaine, while armed with a firearm.  The law provides, in full:

> Notwithstanding Section 11350 or 11377 or any other provision of law, every person who unlawfully possesses any amount of a substance containing cocaine base, a substance containing cocaine, a substance containing heroin, a substance containing methamphetamine, a crystalline substance containing phencyclidine, a liquid substance containing phencyclidine, plant material containing phencyclidine, or a hand-rolled cigarette treated with phencyclidine while armed with a loaded, operable firearm is guilty of a felony punishable by imprisonment in the state prison for two, three, or four years.

Health and Safety Code § 11370.1.  This law does not prohibit intoxication of any sort while in possession of a firearm, much less intoxication from alcohol, a non-controlled substance.  The government has not articulated facts to support any suspicion or

---

[4] At oral argument, the Government argued that the stop was lawfully prolonged pursuant to a "public safety" exception to the Fourth Amendment.  The Court ordered additional briefing on that issue, but the Government appears to have abandoned the argument in its supplemental briefing.  In any event, the exception would not apply in this case where the officer had already established that Defendant was not the assailant and there was no emergency or threat of imminent harm.  *See Mincey v. Arizona*, 437 U.S. 385, 392-93 (1978)

mistaken belief that Defendant possessed a controlled substance.  Accordingly, if the officer mistakenly believed Defendant was in violation of this law, he believed so unreasonably.

### IV. Conclusion

In sum, while the initial stop was lawful, the officer did not have an independent reason to suspect Defendant of wrongdoing sufficient to prolong the stop to inquire about the lawfulness of Defendant's possession of the firearm.  The search was therefore conducted in violation of the Fourth Amendment, and the appropriate remedy is the suppression of the evidence resulting from this search.

For the reasons set forth above, IT IS HEREBY ORDERED that Defendant's Motion to Suppress (ECF No. 24) is GRANTED.  The evidence resulting from the unconstitutional search, including evidence that Defendant was illegally in possession of a firearm, is hereby suppressed.

IT IS SO ORDERED.

Dated:   **September 6, 2024**

Hon. Daniel J. Calabretta
UNITED STATES DISTRICT JUDGE

DJC2 – Shepherd24cr00083.mts