1

2

3

4

5

6

7

8                           UNITED STATES DISTRICT COURT

9                      FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   UNITED STATES OF AMERICA,              No. 2:24-cr-00083-DJC-1

12                 Plaintiff,

13        v.                                ORDER

14   MONTE SHEPHERD,

15                 Defendant.

16

17        Defendant Monte Shepherd is charged with felon in possession of a firearm in

18   violation of 18 U.S.C. § 922(g)(1).  Believing that Defendant was involved in a domestic

19   violence disturbance that had been called into 911, a Sheriff's Deputy stopped

20   Defendant on the street.  During the encounter, the Sherriff's Deputy pointed his taser

21   at Defendant when he did not immediately comply with the Deputy's instructions to

22   stop moving.  Deputies then handcuffed Defendant and retrieved a firearm from his

23   waistband that Defendant had stated he was carrying.  Deputies then emptied

24   Defendants' pockets, locating a knife and pepper spray as well as cigarettes, gloves, a

25   phone, and a wallet.  After Deputies removed Defendant's identification from his

26   wallet and ran his information, they discovered that Defendant was a prohibited

27   person within the meaning of section 922(g)(1).  The Court previously issued an order

28   suppressing evidence in this case.  The Court granted reconsideration of that motion

                                              1

1  based on new evidence that was not presented to the Court at the time of the prior
2  order.

3      The Court now concludes that when the Deputies handcuffed Defendant, they
4  had seized him for Fourth Amendment purposes.  This is consistent with testimony by
5  the Deputy who handcuffed him that he intended to arrest Defendant, as well with the
6  search of Defendant's pockets, which could only be justified by a search incident to
7  arrest.  The Court concludes, however, that the Deputies lacked probable cause to
8  effectuate the arrest.  Accordingly, on reconsideration the Court once again grants
9  Defendant's Motion to Suppress, though with a different scope from the Court's prior
10  order.

11      **I.      Procedural Background**

12      The Court first granted Defendant's Motion to Suppress based on the Deputies'
13  apparent lack of probable cause to arrest Defendant Shepherd.  In granting that
14  motion, the Court only had access to the recordings of two 911 calls and the body
15  camera footage of one Deputy.  After the Court issued its order, the Government
16  moved for reconsideration, arguing that there was probable cause based on crimes
17  not identified in their initial opposition.  In doing so, the Government also attached
18  the body camera footage of the second Deputy who responded to the scene.
19  Because there was new evidence not previously considered, the Court granted
20  reconsideration of its prior order and set an evidentiary hearing.  At the evidentiary
21  hearing, the Court heard testimony from the two Deputies (11/7/24 Tr. (ECF No. 83))
22  and two employees of the firehouse near the incident (11/8/24 Tr. (ECF No. 84)).  The
23  parties filed briefing after the evidentiary hearing.  (Def.'s Br. (ECF No. 85); Gov't Br.
24  (ECF No. 86).)

25      After hearing the evidence and reviewing the briefing, the Court entered a
26  minute order granting the Motion to Suppress and stated that the present written
27  order would follow.  (ECF No. 89.)
28  ////

## II.   Factual Background

While the Court's prior order summarized the factual background of this case, at the time that order was issued the Court did not have the benefit of the full the testimony and evidence.  As such, the Court provides a new recitation of the events that led to Defendant's arrest and the pending charges based on all of the evidence now available to the Court.

On January 27, 2024, the Sacramento County Sheriff's Office ("SCSO") received two 911 calls about an incident between a man and a woman.  (Gov't Ex. 1; Gov't Ex. 2.)[1]  The first was from a citizen who had heard "some lady getting hurt outside." (Gov't Ex. 1 at 0:18–0:19.)  The second was from Fire Dispatch for the Sacramento Metro Fire District ("SMFD") reporting the same incident.  (Gov't Ex. 2.)  SCSO Deputies Dustin Phillips and Anthony Smith were dispatched to the scene with Deputy Phillips arriving first.

Deputy Phillips first encountered Defendant at 12:28:17 AM as Deputy Phillips exited his vehicle.  (Gov't Ex. 3 at 11:28:17.)  Defendant was standing or walking on the sidewalk nearby.  (*Id*. at 11:28:17–12:28:19)  Deputy Phillips ordered Defendant to "step right here," and Defendant initially complied.  (*Id*. at 12:28:22–12:28:25.)  After stepping to where Deputy Phillips indicated, Defendant started to walk backwards. (*Id*. at 12:28:26–12:28:33.)  Deputy Phillips ordered him to stop before drawing his taser and pointing it at him stating "you're going to get fucking tased, stop." (*Id*.) Defendant stopped, and Deputy Phillips instructed him to "step in front of my car." (*Id*. at 12:28:34–12:28:35.)  Defendant complied with this order, though Deputy Phillips restated the instruction two more times.  (*Id*. at 12:28:35–12:28:38.)  Deputy

---

[1] The Government admitted four exhibits into evidence at the evidentiary hearing.  These were the two 911 calls and the two videos from the Deputies' body cameras.  These items were previously lodged with the Court with the list of exhibits admitted available at ECF No. 80.  The Court refers to Government's Exhibit 1 as the civilian 911 call and Government's Exhibit 2 as the 911 call from fire dispatch, Government's Exhibit 3 Deputy Phillips' body camera footage, and Exhibit 4 as Deputy Smith's body camera footage.  Additionally, the time stamps cited for the body camera footage are the synchronized real-time timestamps included within both videos.

Phillips then instructed Defendant to turn and face his police vehicle.[2] (*Id.* at 12:28:38–12:28:40.)  Defendant immediately complied and informed Deputy Phillips that he had a gun, a knife, and pepper spray. (*Id.* at 12:28:40–12:28:51.)

Deputies Phillips and Smith handcuffed Plaintiff's hands behind his back, after which Deputy Phillips removed the gun from the back waistband of Defendant's pants. (*Id.* at 12:28:40–12:29:13.)  Deputies Phillips and Smith then proceeded to enter each of Defendant's pockets and remove all the items they contained.  (*Id.* at 12:29:13–12:30:10; Gov't Ex. 4 at 12:29:13–12:30:10.)  This included gloves, a wallet, a phone, cigarettes, and the aforementioned pepper spray. (*Id.*)  Deputy Phillips also removed the knife from the sheath on Defendant's right hip. (Gov't Ex. at 12:29:26–12:29:27.)  Each of these items were placed on the hood of Deputy Phillips' police vehicle.

Deputy Phillips then placed Defendant in the back of the police vehicle. (*Id.* at 12:30:37–12:30:47.)  As he was being placed in the vehicle, Defendant provided his name and stated that his wallet was in his back pocket, though the Deputies had already removed it. (*Id.* at 12:30:39–12:30:42.)  While this was occurring, Deputy Smith opened Defendant's wallet, removed his ID, and returned to his own vehicle where he ran Defendant's ID through various databases on the "Mobile Data Terminal" in his vehicle.  (Gov't Ex. 4 at 1:30:46–1:32:07; 11/7/24 Tr. at 31:11–13.)  After placing Defendant in the back of his vehicle, Deputy Phillips then returned to the front of the vehicle where he looked through Defendant's wallet and spoke with SMFD Metro 41 Captain Gordon who informed Deputy Phillips that Defendant was not involved in the dispute which had prompted the 911 calls. (Gov't Ex. 3 at 1:31:00–12:31:40.)

Given the particular importance of the specific timing of the events leading to and after Defendant's arrest as well as the rapid sequence of events, the Court

---

[2] It was at about this point when Deputy Smith arrived on the scene.  (Gov't Ex. 4 at 1:28:41.)

provides **Figure 1** as a visual representation to discuss the timeline of events based on the testimony of the Deputies and the timestamps provided by their body camera footage.[3]

**Figure 1**



1:28:00 AM

1:28:17 AM - Deputy Phillips arrives on the scene and makes contact with Defendant Shepherd.

1:28:30 AM - Deputy Phillips points taser at Defendant.

1:28:40 AM - Deputy Smith arrives.

1:28:42 AM - Defendant places hands on hood of police cruiser states that he has a gun, knife, and pepper spray.

1:29:00 AM

1:29:11 AM - Deputy Phillips and Smith handcuff Defendant.

1:29:12 AM - Deputy Phillips removes gun from Defendant's waistband.

1:29:17 AM - Deputy Phillips removes gloves from Defendant's back pocket

1:29:25 AM - Deputy Phillips removes knife from sheath on Defendant's hip.

1:29:36 AM - Deputy Phillips removes wallet from Defendant's pocket.

1:29:40 AM - Deputy Smith removes phone from Defendant's pocket.

1:29:45 AM - Deputy Smith removes cigarettes from Defendant's pocket.

1:30:00 AM

1:30:07 AM - Deputy Smith removes pepper spray from Defendant's jacket pocket.

---

[3] While the Court has endeavored to make the timeline an accurate representation of the series of events, it is not perfectly to scale.

### III.   Legal Standard for Motion to Suppress

The Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause." U.S. Const. amend. IV.  Warrantless searches and seizures violate the Fourth Amendment unless they fall within one of a "few specifically established and well delineated exceptions." *Minnesota v. Dickerson*, 508 U.S. 366, 372 (1993) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)).  "Because warrantless searches and seizures are *per se* unreasonable, the government bears the burden of showing that a warrantless search or seizure falls within an exception to the Fourth Amendment's warrant requirement." *United States v. Cervantes*, 703 F.3d 1135, 1141 (9th Cir. 2012).

Under the exclusionary rule, a criminal defendant may move to suppress evidence obtained in violation of the Fourth Amendment.  *See, e.g.*, *United States v. Calandra*, 414 U.S. 338, 341 (1974); Fed. R. Crim. P. 41(h).  The exclusionary rule covers not just evidence obtained as a direct result of the illegal search or seizure, but also evidence derived from that illegality, which is considered "fruit of the poisonous tree." *United States v. Ngumezi*, 980 F.3d 1285, 1291 (9th Cir. 2020).  When deciding a motion to suppress, courts first determine whether a Fourth Amendment violation occurred, and then whether suppression is appropriate.  *See Davis v. United States*, 564 U.S. 229, 236–39 (2011).

### IV.   Discussion

#### A.  Reasonable Suspicion

##### 1.  Deputy Phillips Reasonable Suspicion upon Contacting Defendant Shepherd

The Court reaffirms its initial finding that upon initially contacting Defendant Shepherd, Deputy Phillips acted with reasonable suspicion that Defendant was engaged in criminal activity.  "[A]n officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable,

1    articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119,

2    123 (2000) (citing *Terry v. Ohio*, 392 U.S. 1 (1986)).  "The 'reasonable suspicion'

3    necessary to justify such a stop 'is dependent upon both the content of information

4    possessed by police and its degree of reliability'" and depends on the totality of the

5    circumstances.  *Navarette v. California*, 572 U.S. 393, 397 (2014) (quoting *Alabama v.*

6    *White*, 496 U.S. 325, 330 (1990)).  "The quantum of proof needed for reasonable

7    suspicion is less than a preponderance of evidence, and less than probable cause."

8    *United States v. Tiong*, 224 F.3d 1136, 1140 (9th Cir. 2000).

9         Here, Deputies Phillips and Smith were originally called to an ongoing physical

10   dispute[4] between a man and a woman at around 1:30 AM near the Metro 41 SMFD

11   firehouse.  When Deputy Phillips arrived at that location he found Defendant alone

12   and a short distance from several onlooking firefighters.  Under the totality of these

13   circumstances, and in particular the time of night and the lack of others at the scene,

14   Deputy Phillips had reasonable suspicion to justifying stopping Defendant Shepherd

15   to investigate.  *Navarette*, 572 U.S. at 397.  Given Defendant informed Deputy Phillips

16   that he had a firearm and Deputy Phillips was acting with reasonable suspicion, it was

17   permissible for Deputy Phillips to remove the firearm from Defendant's possession in

18   order to ensure Deputy Phillips' safety during the encounter.  *Terry*, 392 U.S. at 27.

19        **2.  Arrest of Defendant Shepherd**

20        While a *Terry* stop was justified, the scope of a search permissible by *Terry* is

21   limited.  Under *Terry*, an officer may conduct a search for weapons for the protection

22   of that officer when they have reason to believe that they are dealing with an armed

23   and dangerous individual, even when probable cause is not present.  *Id.*  However,

24   "[t]he scope of the search must be strictly tied to and justified by the circumstances

25   which rendered its initiation permissible."  392 U.S. at 19 (internal citations and

26   _____

27   [4] The parties disagree about whether the Deputies believed this to be a domestic dispute and their
     response as a result.  This point is ultimately irrelevant as Deputy Phillips would have had reasonable
     suspicion upon first contacting Defendant regardless of whether the call was for a domestic violence

28   incident.

1    quotation marks omitted).  A warrantless search outside the bounds of what is

2    permitted by *Terry* must fall within one of the other exceptions to the warrant

3    requirement.  Here, the only applicable exception would be search incident to arrest,

4    which requires that the arrest be supported by probable cause.  *United States v.*

5    *Robinson*, 414 U.S. 218, 235 (1973); *United States v. Hartz,* 458 F.3d 1011, 1019 (9th

6    Cir. 2006).

7         After Defendant Shepherd was handcuffed and Deputy Phillips had removed

8    the handgun from Defendant's waistband, Deputies Phillips and Smith proceeded to

9    enter Defendant's pockets and remove all items from Defendant's person.  This

10   included the knife from Defendant's waist and the pepper spray from his jacket but

11   also multiple items from Defendant's pockets that were not weapons or otherwise

12   dangerous.  Deputy Phillips removed gloves from Defendant's back pocket and a

13   wallet from his right pocket while Deputy Smith removed a pack of cigarettes and

14   cellphone from Defendant's left pocket.[5]

15        There is no evidence that suggests these items were removed for any reason

16   that could be justified under *Terry*.  In their closing brief Government argues that the

17   Deputies' actions in reaching into Defendant's pockets were part of the *Terry* pat

18   down.  However, it is clearly established law in the Ninth Circuit that the search of a

19   pocket is not permissible under *Terry* where "there were no special factors that might

20   have suggested the need for such immediate and more intrusive measures."  *United*

21   *States v. Brown*, 996 F.3d 998, 1010 (9th Cir. 2021); *see Sibron v. New York*, 392 U.S.

22   40, 65 (1968).  The evidence presented does not establish that there were special

23   factors present to justify intrusive and immediate measures as Defendant was already

24   handcuffed, was seemingly compliant, and had even informed the Deputies both that

25   he had a gun, knife, and pepper spray and where each item could be located.

26   _____

27   [5] This is not an exhaustive list of the items removed from Defendant's pockets, only those that are immediately visible in the body camera footage.  For example, later footage shows a toothbrush on the hood of Deputy Phillips vehicle, but this item cannot be easily identified during Deputies' removal of

28   items from Defendant's pocket.

1   Moreover, it is not clear that even in the presence of special factors, the Deputies

2   search would be permissible under *Terry*.  The Deputies did not search a single

3   pocket or location where they believed weapons might be present but entered each

4   of Defendant's pockets <u>and</u> removed all of the items they contained, regardless of

5   what they were and if they were dangerous.  Even if there were special factors present

6   – though no evidence suggests that they were present – the extensive search and

7   removal of all items from Defendant's pockets was also consistent with a limited more

8   intrusive search permitted by cases like *Brown*.

9       In reality, the Deputies' actions at this point in the stop were clearly a traditional

10  search, not a *Terry* pat down.  As the Deputies Phillips and Smith did not have a

11  warrant[6], a search of Plaintiff is presumptively unreasonable unless it falls within one of

12  the recognized exceptions to the Fourth Amendment, *Cervantes*, 703 F.3d at 1138–

13  39, which relevant here would be a search incident to Defendant's arrest.  This is

14  consistent with Deputy Phillips' testimony at the evidentiary hearing that once he

15  "found" the firearm that he knew he was going to "make the arrest" of Defendant.

16  (11/7/24 Tr. at 55:7-11.)  However, to search Defendant incident to arrest, the

17  Deputies needed probable cause to arrest Defendant.

18      **B.  Probable Cause**

19      To justify an arrest, officers must have probable cause based on the facts

20  available to them at that time for the arrest.  *Beck v. Ohio*, 379 U.S. 89, 96 (1964)

21  ("When the constitutional validity of an arrest is challenged, it is the function of a court

22  to determine whether the facts available to the officers <u>at the moment of the arrest</u>

23  would warrant a man of reasonable caution in the belief that an offense has been

24  committed." (emphasis added) (internal citations and quotation marks removed)).

25  ───────────────

26  [6] The Government includes in their briefing a prior argument about the fact that Defendant Shepherd
    apparently had an active warrant for his arrest at the time of that incident.  There is no evidence that the
    Deputies were aware of this <u>at the time of the arrest</u>.  As such, the existence of this warrant cannot justify

27  the SCSO Deputies' search after the fact.  *Moreno v. Baca*, 431 F.3d 633, 642 (9th Cir. 2005) ("Because
    the Deputies did not know of Moreno's parole status and his outstanding arrest warrant at the time they

28  searched and seized him, those circumstances cannot justify their conduct.").

1    Given the rapid series of events, it is hard to pinpoint precisely when Deputy Phillips

2    first sought to arrest Defendant but doing so is unnecessary in this case.  Because

3    Deputies Phillips and Smith needed to have probable cause at the point they

4    searched and emptied Defendant's pockets, the Court concludes that the Fourth

5    Amendment seizure of Defendant occurred at the latest by the 1:29:17 AM entry on

6    Figure 1, *supra*.

7        The Government argues Deputies Phillips and Smith had probable cause to

8    believe Defendant had violated three sections of the Penal Code: (1) section 148, (2)

9    section 647, and (3) section 25400.  Upon examination of each, the Court concludes

10    that the Deputies lacked probable cause at the time of the search.

11        **1.  Penal Code Section 148(a)(1)**

12        Section 148(a)(1) makes it illegal to willfully resist, delay, or obstruct a peace

13    officer in the discharge of their official duties.  "Under California Penal Code

14    § 148(a)(1), the legal elements of a violation are as follows: (1) the defendant willfully

15    resisted, delayed, or obstructed a peace officer, (2) when the officer was engaged in

16    the performance of his or her duties, and (3) the defendant knew or reasonably should

17    have known that the other person was a peace officer engaged in the performance of

18    his or her duties." *Smith v. City of Hemet*, 394 F.3d 689, 695 (9th Cir. 2005) (cleaned

19    up).

20        The Government's argument that Defendant violated section 148 entirely

21    hinges on the events immediately after Deputy Phillips' arrival on the scene.  Deputy

22    Phillips testified that during this period he was concerned that Defendant might run or

23    fight him because he was showing "preflight" or "prethreaten" indicators because he

24    was looking around, backing away, and raising his hands.  (11/7/24 Tr. at 21:16–22:1.)

25    This led to him pointing his taser at Defendant. (*Id.* at 21:9–15.)

26        Reviewing Deputy Phillips' body camera footage, Defendant does seem to

27    show some reluctance to be detained.  However, this alone does not establish a

28    violation of section 148(a)(1).  As noted above, Deputy Phillips exited his vehicle at

roughly 1:28:17 AM.  Less than 30 seconds later, Defendant had his hands on the hood of Deputy Phillips' vehicle and was fully compliant.  In that intervening 30-second period, Deputy Phillips gave four sets of instructions.  First, Deputy Phillips ordered Defendant to "step right here" and Defendant complied.  Defendant then started to walk backwards, and Deputy Phillips issued his second order instructing Defendant to stop.  When Defendant did not immediately stop backing up, Deputy Phillips pulled his taser, pointed it at Defendant, and again instructed him to stop, telling him that he would get tased if he did not follow the instruction.  Defendant stopped moving at this point.  Deputy Phillips then gave a third set of instructions, telling Defendant to "step in front of my car" three times which Defendant complied with on the first instruction.  Deputy Phillips then gave his final instruction, telling Defendant to put his hands on the hood of the vehicle, which Defendant immediate did.

The Government's argument that Deputy Phillips had probable cause to arrest Defendant for violation of section 148(a)(1) thus rests on (1) Defendant walking backwards a few feet after initially complying with Deputy Phillips' first commands, and (2) not immediately freezing on Deputy Phillips' first "stop" command.  The Government has cited no case that stands for the proposition that such minimal acts can constitute resisting, delaying, or obstructing Deputy Phillips.  *Smith v. City of Hemet*, 394 F.3d 689 (9th Cir. 2005), on which the Government mainly relies, is clearly distinguished from the present facts.  In *Smith*, the individual refused multiple commands to remove his hands from his pockets, responded instead with expletives, walked away from an officer into his home before later returning with his hands still in his pockets, and refused orders to put his hands on his head.  394 F.3d at 693.  Defendant Shepherd's conduct is substantially less significant; the evidence does not

1  show that Defendant specifically refused any orders, let alone multiple times as was

2  the case in *Smith*.[7]

3        The Government's briefing focuses specifically on the "delay" portion of section

4  148(a)(1), but as stated, Defendant and Deputy Phillips' initial interaction lasted 30

5  seconds.  To be even more precise, the entire sequence of Defendant Shepherd

6  walking backwards and failing to follow Deputy Phillips' first "stop" order lasted only 5

7  seconds in total.  The Government cites no case that shows that 5 seconds of

8  imperfect compliance can constitute a "delay" for purposes of section 148(a)(1).  As

9  stated by California's Sixth District Court of Appeal in *In re Muhammed C.*, "it surely

10  cannot be supposed that Penal Code section 148 criminalizes a person's failure to

11  respond with alacrity to police orders."  95 Cal. App. 4th 1325, 1330 (2002).

12  Accordingly, the Court finds that Deputies Phillips and Smith lacked probable cause

13  to believe that Defendant Shepherd had violated Penal Code section 148(a)(1).

14        **2. Penal Code Section 647(f)**

15        The evidence presented shows that at the time of their interaction with

16  Defendant Shepherd, the SCSO Deputies believed that being under the influence of

17  alcohol while in possession of a firearm was a crime.  During the incident, Deputy

18  Phillips was recorded as stating "well, he's drunk, and he has a gun." (Gov't Ex. 3 at

19  11:32:08–11:32:11.)  Deputy Smith is also later recorded saying, "he's drunk, you can't

20  have a firearm when you're drunk." (Gov't Ex. 3 at 11:34:32–11:34:35.)  Deputy

21  Phillips' report similarly states that Defendant was booked based on, among other

22  things, a violation of "HS 11370.1: Possession of a firearm while intoxicated." (ECF No.

23  64-2 at 8.)  During his testimony at the evidentiary hearing, Deputy Smith again

24  asserted that it was a misdemeanor to be drunk while in possession of a firearm.

25  (11/7/24 Tr. at 78:17–21.)

26

27  [7] To be sure, the court in *Smith* stated that "[e]ach of [the defendant's] acts constituted a violation of
§ 148(a)(1) sufficient to warrant the filing of a criminal charge."  *Smith*, 394 F.3d at 697.  In addition to

28  being *dicta*, this statement is of limited guidance here given that none of Defendant Shepherds actions
are meaningfully comparable to any of the actions of the individual actions of the defendant in *Smith*.

As detailed in the Court's original order on this suppression motion, Health and Safety Code section 11370.1, which Deputy Phillips cited Defendant as violating, does not criminalize possession of a firearm while under the influence of alcohol. The relevant portion of section 11370.1 states:

> Notwithstanding Section 11350 or 11377 or any other provision of law, every person who unlawfully possesses any amount of a substance containing cocaine base, a substance containing cocaine, a substance containing heroin, a substance containing methamphetamine, a crystalline substance containing phencyclidine, a liquid substance containing phencyclidine, plant material containing phencyclidine, or a hand-rolled cigarette treated with phencyclidine while armed with a loaded, operable firearm is guilty of a felony punishable by imprisonment in the state prison for two, three, or four years.

Through section 11370.1, the legislature criminalized possession of a firearm while under the influence of certain substances. The legislature had the ability to include alcohol within this section but chose not to do so.

As section 11370.1 does not make possession of a gun while intoxicated a crime, the Government has since turned to Penal Code section 647(f) to argue that Defendant's possession of a firearm while intoxicated was still illegal. (Gov't Br. at 14–15.) Section 647 is a statute which covers "disorderly conduct" that might implicate public safety. Unlike section 11370.1 which outright criminalizes possession of a firearm by individuals under the influence of certain substances, section 647(f), despite sometimes colloquially referred to as "drunk in public," is concerned with conduct that implicated public safety by individuals under the influence of alcohol.

A violation of section 647(f) requires that "the [individual] is (1) intoxicated (2) in a public place and either (3) is unable to exercise care for his own safety or the safety of others *or* (4) interferes with or obstructs or prevents the free use of any street, sidewalk, or public way." *People v. Lively*, 10 Cal. App. 4th 1364, 1368-69 (1992) (emphasis in original). The first two requirements are easily met here. Defendant was

13

present in a public place.  Additionally, during the evidentiary hearing Deputies

Phillips and Smith both testified that Defendant showed signs of intoxication.  While

Deputies did not conduct field sobriety tests, they described a smell of alcohol along

with red and watery eyes.  (11/7/24 Tr. at 25:23–24.)  The Deputies also

contemporaneously assessed that Defendant was intoxicated at the time of their

encounter with him as they can be heard discussing Defendant as being "drunk"

multiple times in the body camera footage.  Application of section 647(f) falters,

however, as there is no evidence that Defendant was interfering with or obstructing a

street, sidewalk, or public way,[8] or that Plaintiff was unable to exercise care for his own

safety or the safety of others.

   In determining whether an intoxicated person is capable of exercising care for

themselves or others, courts consider the totality of the circumstances.  *People v.*

*Lively*, 10 Cal. App. 4th 1364, 1372 (1992).  As noted above, the Government argues

that probable cause existed to believe Defendant was unable to exercise care for the

safety of himself and others based exclusively on the fact that Defendant was in

possession of weapons while inebriated.  (Gov't Br. at 14–15.)  While the Court is

sympathetic to this argument from a public policy perspective, the application of

section 647(f) in this way appears entirely unsupported.

   The Ninth Circuit's unpublished decision in *United States v. Williams*, which the

Government cites, is the most directly relevant case, but *Williams* presents a drastically

different situation than the case presently before the Court.  No. 21-10357, 2023 WL

2755319, at *1 (9th Cir. 2023).  In *Williams*, the Ninth Circuit found that "the record

support[ed] the district court's conclusion that [Defendant] . . . was unable to care for

the safety of others because he possessed a dangerous weapon while visibly

---

[8] The Government has not argued that Defendant was obstructing or interfering with a street, sidewalk, or public way, and the evidence would not support such an argument so the Court need not address this alternate element.

inebriated, <u>and that he used that box cutter to threaten another person</u>." *Id.* (emphasis added). Thus, the *Williams* court did not rely solely on the defendant's simple possession of a weapon, but the defendant's active use of that weapon to threaten someone.

The Government also cites *Dominguez v. City of Los Angeles*, No. 21-cv-06369-FMO-KSx, 2024 WL 3914873 (C.D. Cal. Aug. 15, 2024), for this same purpose. But this case is inapposite for similar reasons as *Williams*. In *Domiguez*, it was "undisputed that [the officer] had probable cause to believe [the defendant was so intoxicated that he posed a safety hazard[,]" based on the fact that "[the defendant] was carrying a knife . . . , yelling obscenities . . . , intoxicated . . . , and confronted the officers when they arrived on the scene[,]" along with the fact that the officer believed the defendant "was in a condition to possibly assault an innocent subject for walking near him." *Dominguez*, 2024 WL 3914873, at *7 (cleaned up). The only similarities between *Dominguez* and this case are the intoxication of the defendant and the simple fact of possession of a weapon, but the *Dominguez* court did not rely solely on these facts.

The Government here asks that the Court to significantly extend the logic of *Williams* and *Dominguez* to find that any intoxicated individual simply in possession of a weapon cannot exercise care for his own safety or the safety of others. The Court will not do so. This is the sort of strict criminal liability that Health and Safety Code section 11370.1 imposes for other substances, but alcohol was omitted from section 11370.1, and this would be inconsistent with the function and application of Penal Code section 647.

The usage of section 647(f) for inebriated persons in possession of a motor vehicle is an instructive analogy to show why probable cause did not exist solely on Defendant's possession of a firearm. In several instances, courts have found officers had probable cause for a violation of section 647(f) where an individual was drunk and in possession of a motor vehicle. Importantly though, the officers in those cases had some indication that the defendant had driven or intended to operate their vehicle at

the time of their arrest.  *See, e.g.*, *Lively*, 10 Cal. App. 4th at 1367–68 (Witness reported the defendant operating a motor vehicle.  Officers found the defendant in the driver's seat of the vehicle with keys in the ignition and the hood of the vehicle warm.); *People v. Kelley*, 3 Cal. App. 3d 146, 150 (1969) ("[The] defendant was found in the early morning slumped behind the steering wheel of an automobile which was standing on a public street with its lights out and the motor running."); *Dell'Orto v. Stark*, 123 Fed. Appx. 761, 762 (9th Cir. 2005) (Finding probable cause to arrest an individual for violation of section 647(f) where an officer saw a staggering and "observed [the individual] get into his car and place his key in the ignition."); *see also Lively*, 10 Cal. App. 4th at 1371–72 (Noting the California Supreme Court's comment in *Mercer v. Dept. of Motor Vehicles*, 53 Cal. 3d 753, 762–63 (1991) that the plaintiff in that action could have been found to have violated section 647(f) based on the fact that he was "intoxicated, at the helm of a vehicle, and with the capability of putting the vehicle in motion.").

By contrast, where there was no indication that an individual had driven or intended to drive, other courts have suggested that probable cause did not exist for a violation of section 647(f).  In *Maya v. County of San Bernardino*, No. 19-cv-01871-JGB-KKx, 2023 WL 4383344 (C.D. Cal. June 1, 2023), the court considered, among other things, whether officers had probable cause to believe an individual had violated section 647(f).  The court ultimately rejected that there was clearly probable cause for a violation of section 647(f) and compared the facts of its case to those in cases such as *Lively* that involved a clear indication that the individual had or intended to operate their vehicle.  *Id.* at *21  In doing so it stated:

> There is not a single fact in the record that suggests the deputies were remotely concerned that Plaintiff might have driven his vehicle when intoxicated. By all accounts, Plaintiff was hanging out with his friend and his son in their home and then, for a little while, on the street outside. The engine was not running and Plaintiff was not behind the wheel. The deputies did not ask a single question about

Plaintiff's intent to drive. Defendants have never argued
that Plaintiff might have been unable to care for himself or
others because he might have driven when intoxicated.

*Id.* at *21 n.34.

While the present case does not concern a motor vehicle, these cases are
illustrative that section 647(f) is concerned with the conduct that threatens public
safety, not simply that an intoxicated individual has theoretical access to a weapon or
motor vehicle that could pose a threat to public safety.  At the time of his encounter
with the SCSO Deputies, Defendant Shepherd was in possession of several weapons.
But there is no evidence in the record that the Deputies believed or had reason to
believe that Defendant had used or was going to use any of the weapons.  The
evidence in this case is thus more akin to an intoxicated individual who is standing
adjacent to their vehicle, than one who is passed out in the driver's seat with the keys
in the ignition and the car running.

The Ninth Circuit and California courts "rigorously enforce[] the unable to care
for the safety of oneself or others requirement."  *Maya*, 2023 WL 4383344, at *21.  As
noted by the Ninth Circuit in *Velasquez v. City of Long Beach*, "under California law, a
criminal defendant must be 'incapacitated as a result' of a substance to be convicted
of public intoxication under section 647(f)."  793 F.3d 1010, 1022 n.10 (9th Cir. 2015)
(quoting *People v. Rich*, 72 Cal. App. 3d 115, 122 (1977)).  This determination is made
based on whether the evidence presented shows that under the totality of the
circumstances, the defendant was unable to care for his own safety or the safety of
others.  *Lively*, 10 Cal. App. 4th at 1372-73.  Here, while Defendant was observed to
be drunk, there has been no other evidence presented that suggests he could not
care for the safety of himself or others beyond his simple possession of a firearm.  The
cases cited above involve defendants who had clear indicators of their inability to care
for the safety of others and themselves.  They include defendants who "pointed a box
cutter with the blade open . . . [and] appeared to be 'angling' for a fight and

1  threatened [a] victim[,]" *Williams*, 2023 WL 2755319, at *1; were yelling obscenities,

2  confronting officers, and appeared to be in a condition to assault innocent passersby,

3  *Dominguez*, 2024 WL 3914873, at *7; "[had a] blood alcohol level . . . almost four

4  times the legal limit . . . [who were] unable to walk without staggering[,]"  *Lively*, 10

5  Cal. App. 4th at 1373; or presented similar conditions that showed they were unable

6  to care for their or others' safety under the totality of the circumstances.  The

7  government has presented no such evidence in this case.

8        Finally, there is no evidence that Defendant was unable to care for himself.  A

9  review of the video indicates that the Defendant was able to stand and walk on his

10  own volition and was able to follow verbal commands.   Significantly, prior to the

11  arrival of the SCSO Deputies, Defendant Shephard spoke with Ryan Seamans, a

12  certified EMT with SMFD.  Seamans testified that he had told Defendant to "go back

13  home" and that while he was "confused as to why [Defendant] wanted to remain on

14  scene," he was not stressed by Defendant remaining there.  (11/8/24 Tr. (ECF No. 84)

15  at 15:17–24, 19:21–20:1.)  That Seamans, an EMT, expressed no concern with

16  Defendant's condition and felt it was safe for Defendant to simply return home further

17  emphasizes that there was no evidence indicating that Defendant was in a condition

18  that rendered him to be unable to exercise care for himself or others.[9]

19        In light of the above, SCSO Deputies lacked probable cause to believe

20  Defendant was violating 28 U.S.C. § 647(f) as Defendant's possession of weapons

21  while intoxicated is insufficient on its own to establish that, under a totality of the

22  circumstances, Defendant was unable to exercise care for his own safety or the safety

23  of others.

24  ////

25  ////

26

27  [9] During Seaman's testimony,  The Government asked questions about Defendant's "erratic" behavior.
   However, Seamans was clear that he "[did not] want to say [defendant was acting] erratic, but he just
28  was anxious and wanted to be there for whatever reason."  (11/8/24 Tr. at 18:6–9.)

### 3.  Penal Code Section 25400

Section 25400 criminalizes concealed carry of a firearm without a permit.  *See* Pen. Code § 25400.  As stated in the Court's first order on Defendant's Motion to Suppress, following *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022), California law was amended such that it is now a "shall issue" jurisdiction meaning that a concealed permit "shall issue" to applicants who meet certain criteria. *See* Cal. Dep't of Justice, *Legal Alert*, OAG-2022-02 (June 24, 2022); Cal. Penal Code § 26150(a) (2024); Cal. Penal Code § 26202.  These amendments were in effect during this incident.  Under Ninth Circuit precedent, when in a "shall issue" jurisdiction, concealed carry of a firearm is presumptively lawful and cannot form the basis of even reasonable suspicion.  *United States v. Willy*, 40 F.4th 1074, 1081 (9th Cir. 2022) (open carry); *United States v. Brown*, 925 F.3d 1150, 1154 (9th Cir. 2019) (concealed carry);[10] *cf. Delaware v. Prouse*, 440 U.S. 648, 663 (1979) (holding that unless there is a particularized suspicion that a driver is unlicensed, officers are prohibited from stopping drivers solely to ensure compliance with licensing and registration laws).

As such, Defendant's possession of a concealed firearm was presumptively lawful and could not form the basis of probable cause for a violation of Penal Code section 25400.

### 4.  Probable Cause for Other Offenses

In their closing briefing, the Government raises four other offenses for which they argue the Deputies developed probable cause "as their investigation progressed . . . ."  (Gov't Br. at 11.)  The Government does not make any actual argument for how the Deputies had probable cause for these offenses, but since they were raised at various points during the Court's consideration of the Motion to

---

[10] In *United States v. Holmes*, No. 22-50003, 2023 WL 4196896, at *1, n.1 (9th Cir. June 27, 2023) the Ninth Circuit decline to opine on the effect of *Bruen* on California's licensing scheme because the arrest in that case had occurred in 2021 before the changes to the law.

1   Suppress, the Court addresses them for completeness.  The Deputies did not have

2   probable cause for two of the Penal Code provisions cited – section 25850(c)(1),

3   possession of a loaded firearm by a convicted felon, and section 22810, possession of

4   pepper spray by a convicted felon – as the Deputies had no reason to know or believe

5   that Defendant was a convicted felon at the time of the search.  Similarly, the Deputies

6   also lacked probable cause based on Penal Code section 25850(c)(3), which

7   criminalizes possession of a loaded firearm by an active participant in a street gang,

8   because there is no evidence that shows the Deputies had a basis to believe

9   Defendant was a gang member at the time of the search.

10          The fourth and final Penal Code section the Government cites is section 21310,

11   possession of a concealed dirk or dagger.  The Government has not met their burden

12   to establish that probable cause existed for this offense.  *Cervantes v. United States*,

13   278 F.2d 350, 351 (9th Cir. 1960).  Even if the Government had included any

14   argument as to the application of section 21310, it does not appear that probable

15   cause would have existed for a violation of that Penal Code section.  Deputy Phillips

16   testified that the knife was in a sheath attached to Defendant's belt on his hip.

17   (11/7/24 Tr. at 15:14–23.)  While Deputy Phillips also stated that Defendant's jacket

18   was covering the sheath, Deputy Phillips' body camera footage shows the sheath

19   visible on Defendant's hip during the interaction.  (Gov't Ex. 3 at 1:28:34–1:28:35,

20   1:28:40–1:28:41.)  "The dirk or dagger concealed-carrying restriction . . . limits the

21   manner of exercising that right by proscribing concealed carrying of a dirk or dagger

22   <u>unless the bearer uses a visible knife sheath</u> . . . ."  *See People v. Mitchell*, 209 Cal.

23   App. 4th 1364, 1374 (2012).  Given the sheath was worn openly on defendant's waist,

24   Deputies lacked probable cause for a violation of section 23130.  *Id.*  Moreover, the

25   Government also has not presented any evidence that the knife in fact qualified as a

26   dirk or dagger.  The Government has thus not met their burden to show that the

27   Deputies had probable cause to arrest Defendant for carrying a concealed dirk or

28   dagger in violation of Penal Code section 23130.

20

1   Accordingly, the Government has not shown that SCSO Deputies did not have

2   probable cause for violations of these other offenses and thus the Deputies' search of

3   Defendant Shepherd was unlawful.

4   **C.  The Exclusionary Rule**

5   Given the search of Defendant's pockets was outside the scope of *Terry* and

6   that Deputies Phillips and Smith lacked probable cause to support Defendant's arrest,

7   the Court must then turn to what evidence must be suppressed under the

8   exclusionary rule.  *Ngumezi*, 980 F.3d at 1290.  On review, the Court excludes all non-

9   weapon items taken from Defendant's person including, but not limited to, the phone,

10  gloves, cigarettes, and, most notably, Defendant's wallet and its contents.  These items

11  were clearly obtained via a warrantless search.  All statements made by Defendant

12  after the Deputies began removing items from Defendant's pockets are also excluded

13  as they were also a product of that search.[11]  *United States v. Crawford*, 372 F.3d 1048,

14  1054 (9th Cir. 2004) (en banc).  On the flipside, the firearm is not excluded; that

15  evidence was obtained prior to the illegal search.  The Court also does not exclude

16  the knife or pepper spray.  While those items were removed during the illegal search,

17  the SCSO Deputies also had reasonable suspicion to conduct a *Terry* frisk.  *See Supra*

18  IV.A.1.  Defendant notified the Deputies of the location of the knife and pepper spray

19  and, had officers stayed within the scope of what is permitted under *Terry*, the

20  Deputies would still have been permitted to remove these weapons.  The inevitable

21  discovery doctrine thus applies as the Deputies would still have lawfully obtained

22  these items as part of the frisk if they had not conducted a broader, unlawful search.

23  *See United States v. Ramirez–Sandoval*, 872 F.2d 1392, 1399 (9th Cir. 1989) (stating

24  that the inevitable discovery doctrine exception to the exclusionary rule applies when

25

26

27  _____

[11] Given that the removal of items from Defendant's pockets began with Defendant's gloves

28  immediately after the gun was removed from his waistband, the exclusion imposed by the Court below begins after the removal of the gun, though the Court does not expect this distinction to be meaningful.

1    "by following routine procedures, the police would inevitably have uncovered the

2    evidence.").  As such, the pepper spray and knife are not excluded from evidence.

3        The Government asks that the Court not apply the exclusionary rule based on

4    the limited exceptions recognized by the Supreme Court "where the introduction of

5    reliable and probative evidence would significantly further the truthseeking function

6    of a criminal trial and the likelihood that admissibility of such evidence would

7    encourage police misconduct is but a 'speculative possibility.'"  *United States v.*

8    *Rosales-Aguilar*, 818 F.3d 965, 969 (9th Cir. 2016) (quoting *James v. Illinois*, 493 U.S.

9    307, 311–12 (1990)).  The Government argues that exclusion of evidence is

10   unwarranted in this case as the SCSO Deputies acted reasonably and that "there is no

11   evidence in this case tending to show police lawlessness nor misconduct."  (Gov't Br.

12   at 16.)

13        The exclusionary rule is not applied based on the "lawlessness" or misconduct

14   of officers.  Instead, the purpose of the exclusionary rule is "to compel respect for the

15   constitutional guarantee."  *Davis v. United States*, 564 U.S. 229, 236 (2011).  That is the

16   function served in the Court's decision to apply the rule in this case.  The limited cases

17   where Fourth Amendment rights were violated and the exclusionary rule was not

18   applied[12] were those in which officers were acting in good-faith reliance on invalid

19   warrants, erroneous information, or police negligence leading to poorly kept records.

20   *See Davis*, 564 U.S. at 238–40.  These exceptions do not apply here.  While the Court

21   understands the desire to protect public safety, at its core this case represents a

22   garden-variety, straightforward application of Fourth Amendment principles, and the

23   typical remedy of exclusion is appropriate here.

24    **V.    Conclusion**

25        Having considered the evidence presented and the arguments of the parties,

26   the Court concludes that the search of Defendant's person was unlawful as it was

27

28

---

[12] Excluding principles such as independent and inevitable discovery.

outside the scope of what is permissible under *Terry v. Ohio* and was unsupported by probable cause.  For the reasons stated above, IT IS HEREBY ORDERED that on reconsideration Defendant's Motion to Suppress (ECF No. 24) is GRANTED.  Except for the firearm, knife, and pepper spray, all physical evidence and statements made by Defendant after the firearm was removed from Defendant's waistband are suppressed and excluded from evidence.


     IT IS SO ORDERED.

Dated:   **December 2, 2024**

Hon. Daniel J. Calabretta
UNITED STATES DISTRICT JUDGE


DJC1 – Shepherd24cr00083.mts2